ROGERS, J.
 

 The plaintiff, George W. Barker, and the defendants, Wesley M. Jacob, Sam Reese, Thomas J. Williams, and Elder F. Mansfield, were members in the year 1929 of the Will of the East Lodge No. 4602 of the Grand United Order of Odd Fellows, a negro organization. Plaintiff temporarily renounced and abandoned his membership to institute this suit. The suit is one sounding in damages for the alleged tortious and illegal acts of the defendants, in entering into a conspiracy to oust plaintiff from his membership in the lodge, in ejecting him from a meeting of the lodge, and in prosecuting him without probable cause for disturbing the peace of the lodge, on which charge he was acquitted. >■ Plaintiff demanded $10,000, on various items of alleged damage, from the defendants as joint tort-feasors, and was awarded $200 on his demand by the district court. From this judgment the defendants appealed. Plaintiff answered the appeal, praying for an increase in the amount awarded him by the judgment.
 

 The Will of the East Lodge No. 4602, which is located in the city of Crowley, is a subordinate lodge of what is known as the District Grand Lodge of Louisiana, which, in turn, is under .the supervision of a superior body styled the “subcommittee of management,” which meets semiannually in the city of Philadelphia in the months of January and July.
 

 The meeting of the local lodge at which the incidents giving rise to the present suit occurred was held on June 21, 1929. At that time, plaintiff had been a member of the lodge for about' sixteen years, and was. a Past No
 
 *146
 
 ble Father, which, we take .it, is quite an exalted rank in the fraternity. The defendant Sam Reese was the Noble Grand, and the defendants Thomas J. Williams and Elder F. Mansfield were respectively assistant elective secretary and permanent secretary. The duty of the elective secretary is to attend to the correspondence and keep the minutes of the lodge, while the duty of the permanent secretary is to attend to its finances. The defendant Jacob, apparently, held no office, although previously he had occupied the position of “Elective Secretary.”
 

 We find, from our consideration of the record, that plaintiff has not proved the essential allegations of his petition. He utterly failed to establish the existence of any conspiracy on the part of the defendants to oust him from membership in the lodge, or that the defendants maliciously and without probable cause prosecuted him before the city court of Crowley for disturbing the peace of the lodge. On the contrary, the record discloses, to oiir satisfaction, that whatever difficulties plaintiff might have experienced with the lodge or with certain of its members were largely the result of his own making. He is, apparently, of a contentious disposition and was somewhat of a “trouble maker” himself. Influenced, perhaps, by what he conceived to be the prerogative of his rank as a Past Noble Father, plaintiff seems to have assumed a patera nal attitude towards the lodge, seeking to regulate its business and affairs after the manner of a father dealing with his immature children.
 

 On one occasion, plaintiff had a difficulty with one of his brethren, Hines Reed, whom he accused of owing him a debt. Shortly thereafter plaintiff was excused and left the meeting before adjournment, hiding himself behind a door in the anteroom. When Reed left the lodgeroom after adjournment, plaintiff, from his hiding place, struck him violently on the head with a loaded stick, which it appears it was his custom to take with him to all lodge meetings. On another occasion plaintiff refused, in open meeting, to abide by some of the rules of the order and to ren-. der proper obedience to the sound of the gavel, symbolizing the authority of the Noble Grand, and he was fined $5 for his contumacy.
 

 In the year 1926, plaintiff and another member of the lodge, Joe Oger, were appointed as a committee to audit the books of Williams, who was the permanent secretary, and of Jacob, who was the elective secretary. This committee, in due time filed its report, showing an apparent shortage of f200 in the funds of the lodge. Both Williams and Jacob vehemently denied that there was any shortage in their accounts. Apparently, after considering the report, the lodge refused to accept it as correct and ordered that the auditing committee be paid and discharged. The action of the lodge was not satisfactory to the plaintiff, who personally took up the matter with B. Y. Baranco, the Grand Master of the District Grand Lodge. Plaintiff’s complaint was considered at the annual meeting of the District Grand Lodge held at Baton Rouge, and the Grand Master appointed Professor R. U. Clark, district supervisor, to investigate the matter. This, however, he was unable to do, because three of the pages in the book in the custody of Jacob, the “Elective Secretary,” had been torn out. Why the duty is imposed upon the elective secretary, and not upon the permanent secretary to act as custodian of the financial records of the lodge is not explained. Barker claims that this was done after the books were returned to Jacob, and Jacob claims that the pages were torn out while the books were in the possession of Barker. Ciark made his report to the Grand Master, and the matter was again taken up at
 
 *148
 
 the meeting of the District Grand Lodge held the following year at Monroe. At this'meeting, on the recommendation of the Grand Master, Barker and Jacob were expelled from the order; and it was also disclosed that the tenure of the office of permanent secretary then held by Williams did not possess the enduring quality imported by its name, for the incumbent Williams was removed from the .office and suspended from the order for six months. Barker and Jacob, however, apologized to the order and shook hands with each other; whereupon, the penalty was suspended conditionally. The minutes of the meeting so far as this incident is concerned are in the following words, viz.:
 

 “At the conclusion of this ‘Question Hour,’ the Grand Master then recommitted to the Grand Lodge the matter pertaining to the disturbed condition of the Will of the East Lodge at 'Crowley, La. The matter had been referred to the Grand Master for adjustment at the last session of the Grand Lodge. The Grand Master recommended that the matter be taken up in open Grand Lodge session before he rendered a decision in the said matter as the visitation of a special deputized messenger had not resulted in remedying the matter.
 

 “The two contending parties, Bros. Jacobs and' Barker, and the Messenger, Prof. R. U. Clark, the delegate from the lodge, Bro. G. W. Easly and others were heard in the matter, which showed that a high state of disorder existed in the midst of the said lodge and community in general, almost extending to bloodshed on some occasions.
 

 “After the extensive hearing, the Grand Master then made the following recommendations :
 

 “That Bros. Barker and Jacobs be expelled from the Order, and that Bro. T. J. Williams be removed from the. office of Permanent Secretary and suspended from the order for six months, and further recommended that E. E. Mansfield be empowered to act as P. S. in the stead of Bro. T. J. Williams.
 

 “Brothers Jacobs and Barker came forward and apologized and shook hands with each other, promising solemnly to bury the hatchet forever and apologizing to the order for their disorderly acts.
 

 “Penalty was suspended pending the keeping of their pledges.
 

 “The Grand Master appointed and authorized Prof. R. U. Clark to make a complete audit of the books and accounts of the Lodge and to make a report of his findings 'to him as quickly as possible.
 

 “The apology of the Brethren was accepted and the.rule (ruling) of the Grand Master was approved by the unanimous vote of the Grand Lodge.”
 
 '
 

 But it appears that on his return to Crowley, Barker, the plaintiff, dug up the hatchet which he had assisted in burying at Monroe. He wrote numerous letters to ,the Grand Master expressing his dissatisfaction and complaining ab.out lodge affairs. Some of these letters intimated that the Grand Master through sinister motives was favoring other members of the lodge as against plaintiff. Barker also personally visited the Grand Master at Baton Rouge for the purpose of discussing the alleged shortage in the funds of the lodge. On this visit he was accompanied by another member of the lodge, C. N. Williams. Plaintiff did this, notwithstanding that, at the Monroe meeting, T. J. Williams had been removed as permanent secretary and suspended from the order for a period of six month§, and Professor R. U. Clark had been appointed to make a complete audit of the books and accounts of the lodge, and to make a report of
 
 *150
 
 his findings as soon as possible to tlie Grand Master.
 

 The record satisfies that there was no cause for the criticism leveled at the Grand Master by the plaintiff. The Grand Master appears to us to be a conscientious officer who tried to do his duty impartially in á difficult situation. He seems to have done all that it was possible to do to have the matter of the alleged shortage investigated, showing no inclination to shield any wrongdoer, if there were such. And he apparently was actuated at all times by a sincere desire to restore peace and harmony to the Crowley lodge.
 

 The incidents that actually brought matters to a climax in the relations between the plaintiff and the lodge arose during this period. The facts, briefly stated are these:
 

 Aurelia Lambert, a negro woman, and a member of a women’s society that met in the lodgeroom, went to the lodgeroom for the purpose of opening it for a meeting of her organization, and, in doing so, she found on the floor the ritual used by the Vice Grand, who had inadvertently left the book in the room. On her way home she passed the store of Barker, the plaintiff, and, knowing that he was an Odd Fellow, gave him the book, explaining at the time that she had found it. This ritual was one of the three rituals which was furnished the local lodge by the subcommittee of management. The loss of the ritual was soon discovered and became the subject of discussions at every meeting of the lodge, because without it the work of the lodge was seriously hampered. Plaintiff was present at all these meetings, but never said a word about the ritual that had been delivered to him by Aurelia Lambert. On the contrary, at one of the meetings, the members present were asked if they had seen the ritual or knew where it was. Plaintiff was among those present and interrogated, and he answered “no” in reply to the direct question. Plaintiff excuses his conduct in failing to deliver the ritual to the lodge on the ground that he did not know that it was the ritual they were referring to, and, in any event, “they” (evidently referring to the officers of the lodge) “should have investigated and saw how it come to be out of the lodge and so on.” After the ritual had been in possession of Barker for a period of about five months, during which time the officers of the lodge were without' the use of it, and were unable to obtain another from the subcommittee of management until they were in a position to be able to explain its disappearance, Sam Reese, the Noble Grand, ascertained in some way that fact. Barker, however, refused to surrender the ritual. At the annual meeting of the District Grand Lodge, which was held shortly thereafter, Reese, the Noble Grand, complained of Barker’s conduct in retaining possession of the ritual. This complaint was taken up on the afternoon of the second day’s session, in accordance with the usual procedure in such matters. After Reese had made -his complaint, the Grand Master requested Barker to state whether or not the complaint was true, and he arose and answered “yes.” He stated that the ritual had been delivered to him by some woman who had found it in the lodge room. In reply to the question of the Grand Master as to why he did not return the book to the proper officer of the lodge, Barker stated the lodge was indebted to him in some amount, and he was holding it until the indebtedness was liquidated. The amount claimed by Barker was 50 cents which he had charged the lodge for the delivery of six chair' seats which they had purchased from him. The lodge paid for the seats, but declined to pay for their delivery. The Grand Master asked Barker if he would return the ritual, but Barker made no audible response and sat down, remarking in an undertone as he did
 
 *152
 
 so that he would not return it. A delegate seated near by heard the remark and informed the Grand Master thereof. The Grand Master then called up Barker and asked him if he had made the remark and whether he intended to return the ritual to the lodge, and Barker then stated he would return it. The Grand Lodge decided to permit the Grand Master to render a decision to the effect that Barker would stand suspended until he had returned the ritual to the lodge. The minutes of the second day’s afternoon session of the District Grand Lodge at Lake Charles contain, among other things, the following record, viz.:
 

 “The case of Brother P. (should be T.) J. Williams, former P. S. of the Will of the East Lodge No. 4602 at Crowley, Louisiana, was taken up and the brother was given a chance to show cause why he disregarded the mandates of the district grand lodge in regard to the surrender of the books and documents belonging to that office; the explanation being unsatisfactory he was fined the sum of $9.99 by the Grand Master for disobedience of the orders of the grand lodge, and the chair was sustained in its ruling by the unanimous vote of the lodge.
 

 “Brothers Barker, Reese, Jacobs, Rev. Ross and Brother Easley were called upon to explain to the grand lodge the cause of the general state of rebellion and confusion that seem to exist in this lodge. Each gave his version of the matter, and at the conclusion of the testimony, the grand lodge proceeded to place a fine of $9.99 on Brother Barker for causing disturbance in the lodge, and said fine to be paid within thirty days to the grand lodge, and he. Brother Barker, was ordered to return the ritual by Sunday, May 26th, or in the event of the failure to so do, shall be declared suspended; the grand lodge upon proper vote sustained the action of the Grand Master.” L
 

 The minutes of the second day’s night session show the following, viz.:
 

 “Brother Barker came forward and offered the proper contrition and asked to be relieved of the fine imposed on him, promising more orderly behavior in the future, and to return the ritual in his possession immediately on his return home; after reprimand from the chair, the relief sought was granted on condition of the compliance with his promise. The Grand Master then recalled his action in the case of Brother P. (T) J. Williams, and relieved him of the fine of $9.99 imposed on him.”
 

 The day after Barker returned to Crowley, which was Friday, he called twice at the residence of Reese for the purpose, as he says, of delivering the ritual. Reese, however, was in St. Martinville, where he had been called by the insurance business in which he was engaged. The following day Reese was also absent from Crowley on business matters. He was at home the next day, Sunday, but on that day Barker went to Alexandria. Barker, however, made no further effort to deliver the ritual to Reese. He contends, as we understand it, that he had complied with his promise to the Grand Lodge by the feeble attempt which he had made to deliver the ritual to Reese. On June 1, 1929, Reese, as Noble Grand, addressed Barker a letter, in which he informed Barker that he had notified Baranco, the Grand Master, of Barker’s failure to return the ritual to him before June 26, 1929 (meaning, of course, May 26,1929), as per the orders of the District Grand Lodge. That he was in receipt of Baraneo’s reply directing him to write Barker to return the book to him. He accordingly requested Barker to return the book to him on or before June 4,1929, notifying him that, if he should fail to comply with the request, he would be suspended at once; Barker did not comply with the request and
 
 *154
 
 deliver the ritual. Instead, under date of June 3, 1929, he wrote a long rambling letter to Baraneo, in which he stated, among other things, that the indications were that a plan had been concocted to prevent him from delivering the ritual to Reese within the three days, which ended on May 26,1929, in accordance with his promise to the District Grand Lodge. He failed to state, however, what the plan was, or by whom it had been concocted, and why he was not able to deliver the ritual to Reese between May 26th and June 4th.
 

 On Friday, June 7, 1929, Barker appeared at the regular meeting of the local lodge. His presence was objected to by some of the members, on the ground that he stood suspended from the order. Other members suggested, however, that he be permitted to remain, as he had no voice in the affairs of the lodge. This suggestion was acquiesced in and Barker remained in the lodgeroom.
 

 If Barker was sincere in his professed desire to return the ritual in accordance with-his promise to the District Grand Lodge, there is no reason why he could not have done so at this meeting or at the following regular meeting, which was held on Friday, June 21,1929. Barker has offered no explanation' whatever of his failure to do this.
 

 In any event, during the opening ceremonies of the meeting of June 21,1929, while the proceedings were in that nebulous state described by one of the witnesses as “betwixt and between”- — -the officers had assumed their respective stations, but the warden had not as yet performed his customary duty of “taking up the pass word” and searching the assembled lodge members for “razors and such things,” to the end that all lethal weapons in the possession of the brethren might be deposited in a‘ safe place pending their fraternal and social intercourse — Barker’s presence was noted and objected to by some of the members. Just who these members were does not clearly appear. But the Noble Grand took cognizance of the objection, temporarily suspended the opening ceremonies, and asked Barker to excuse himself and retire. This Barker flatly refused to do. He walked “up and down the floor just about like a lion in a cage on parade,” defying any of the brethren to put him out, and demanding that the order for his suspension be exhibited to him. At this juncture someone suggested that the “law” be called in to settle the dispute. This was done, “Brothers D. Bazile and James Saunders” were appointed by- the Noble Grand as his messengers to the “law.” When the “law” finally appeared in the persons of two police officers of the city, some of the members precipitately left the lodgeroom. Barker, himself, went downstairs, the lodgeroom being on the second floor of a two-story building. The police officers asked Jacob what the trouble was, and he referred them to Reese, the Noble Grand. Reese explained the situation to the officers and they went downstairs and placed Barker under technical arrest, admonishing him to appear before the city court the next morning, which he did and was tried and acquitted on charges preferred by the officers themselves. The four defendants were called as witnesses at the trial. Subsequently, namely, on June 26,1929, Barker returned the ritual to the lodge.
 

 The record is barren of any testimony tending to show that the defendants Reese and Mansfield entertained any personal ill will whatever towards Barker. It may be that some personal differences existed between plaintiff, and the other defendants Jacob and Williams. But it is plain from the evidence in the record, which we have hereinabove summarized, that Barker’s expulsion from the meeting of the lodge on June 21, 1929, and his subsequent prosecution for disturbing the
 
 *156
 
 peace thereat, was not due to any ill feeling entertained by Jacob and Williams towards him, but was brought on wholly by himself. Regardless of whether Barker’s suspension from the order by the District Grand Lodge was technically correct or not, which it is not necessary to' determine here, he had apparently acquiesced therein. He took no steps to have the action of the District Grand Lodge reviewed by its superior tribunal, the subcommittee on management; nor did he seek reinstatement through the medium of legal proceedings. Barker admits that he was well acquainted with the rules and regulations of the order. He knew when he went to the meetings of the local lodge of June 7 and June 21, 1929, that his status was that of a suspended member, and would remain as such as long as he persisted in his refusal to deliver to the lodge its ritual, which he was wrongfully retaining in his possession. The officers and members of the lodge were entirely justified in believing that Barker had been properly suspended from the order by the District Grand Lodge and were -warranted in acting on that belief. In doing so, they neither exceeded their authority nor exhibited any malice towards plaintiff.
 

 For the reasons assigned, the judgment appealed from is annulled, and plaintiff’s demand is rejected at his costs.